# EXHIBIT A

# Commonwealth *of* Massachusetts

BARNSTABLE, SS.

TRIAL COURT DEPARTMENT
SUPERIOR COURT
DOCKET NO.

LIANA SURDUT,
Plaintiff

v.

TOWN OF ORLEANS;
KIMBERLY NEWMAN, individually and in
her official capacity as Town of Orleans Town
Manager; and MARK REIL, individually and
in his official capacity as Town of Orleans
Assistant Town Manager,
Defendants

**VERIFIED COMPLAINT**

**Jury Trial Demanded**

**NOW COMES** LIANA SURDUT ("plaintiff" or "Mrs. Surdut"), by and through her undersigned counsel, and brings this Verified Complaint against the above-named defendants, the TOWN OF ORLEANS (the "Town"), KIMBERLY NEWMAN ("Ms. Newman"), individually and in her official capacity, and MARK REIL ("Mr. Reil") (collectively, "defendants"), individually and in his official capacity, for the words, acts, and omissions that caused plaintiff to suffer permanent injury, damages and irreparable harm.

In support of this Complaint, plaintiff alleges and states as follows based upon her personal knowledge, information and belief:

## INTRODUCTION

1.      This is an action arising from defendants' words, deeds, and acts towards and against plaintiff who served the Town of Orleans (the "Town") in a variety of capacities over the course of her more than seventeen (17) year career with the Town.

2.      Plaintiff has suffered and will continue to suffer harm as a direct result of defendants' conduct.

3.      Plaintiff seeks:

      A.  an award of nominal damages;

      B.  an award of compensatory damages;

      C.  an award of punitive damages against the individually named defendants;

      D.  an award of Plaintiff's reasonable costs of litigation, including attorney's fees and costs, pursuant to applicable law.

## THE PARTIES

### Plaintiff

4.      Mrs. Surdut is a resident of Barnstable County in the Commonwealth of Massachusetts.

5.      At all times relevant to the Complaint, Mrs. Surdut was an employee of the Town of Orleans.

6.      At the time of her constructive termination, Mrs. Surdut was employed by the Town as its Director of Human Resources.

7.      Mrs. Surdut was born in the Czech Republic and naturalized as a United States citizen in 2022; she is a practicing and devout Christian, a wife, and a mother.

**Defendants**

8.      Defendant, Town of Orleans, is a public employer and municipality in Barnstable County in the Commonwealth of Massachusetts.

9.      Defendant, Kimberly Newman, is an individual and a resident of Barnstable County in the Commonwealth of Massachusetts.

10.     At all times relevant to this action, Ms. Newman has served as Town Manager for the Town of Orleans.

11.     Defendant, Mark Reil, is an individual and a resident of the Commonwealth of Massachusetts.

12.     At all times relevant to this action, Mr. Reil has served as Assistant Town Manager for the Town of Orleans.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this matter pursuant to M.G.L. ch. 258, § 3, which provides that the "superior court shall have jurisdiction of all civil actions brought against a public employer", and other applicable laws. Plaintiff presented her claim to both individual defendants and the Town of Orleans Select Board on or about April 3, 2024, in accordance with M.G.L. ch. 258, § 4. The parties attempted to settle the matter short of instituting this action but failed to reach a compromise when plaintiff rejected defendants' final offer on August 2, 2024.

14.     Venue is proper because plaintiff and defendants are situated in and/or residents of this county, and a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this county.

## ALLEGATIONS COMMON TO ALL COUNTS

15.    Mrs. Surdut has been a Town employee for more than seventeen (17) years.

16.    Mrs. Surdut holds a Masters in Business Administration degree.

17.    During her tenure as a Town employee, Mrs. Surdut has held a variety of roles and positions.

18.    Mrs. Surdut has received promotions throughout her career with the Town.

19.    Mrs. Surdut has never received any demotions throughout her career with the Town.

20.    Before defendants' employment with the Town began, Mrs. Surdut's personnel record with the Town was unblemished.

21.    Before defendants' employment with the Town began, Mrs. Surdut's job performance had always been satisfactory.

22.    Mrs. Surdut has built strong and friendly working relationships with the vast majority of her colleagues over the years.

23.    Mrs. Surdut has always discharged her duties in a competent, poised, and professional fashion.

24.    From 2017 until November of 2023, Mrs. Surdut served the Town as its Assistant Town Administrator.

25.    In her role as Assistant Town Administrator, Mrs. Surdut performed both administrative functions and handled personnel matters akin to human resources and acted as the Town Administrator in the absence of the Town Administrator, in whose stead she would handle tasks such as signing and reviewing contracts.

26.    As Assistant Town Administrator, Mrs. Surdut assisted with the Town's cyclical functions such as Town Meetings, Budgets, and Capital Improvement Plan(s).

27.     As Assistant Town Administrator, Mrs. Surdut oversaw recruitment and hiring; evaluation, training, discipline, separation and termination; she managed collective bargaining agreements and regularly was the Town's point person for interfacing with union representatives; conducted organizational and classification studies for compensation purposes; she ensured compliance with federal, state, and local requirements; and she regularly attended the Personnel Advisory Board.

28.     As Assistant Town Administrator, Mrs. Surdut's role had supervisory functions, which included overseeing the Library, Council on Aging, and the Town Clerk.

29.     As Assistant Town Administrator, Mrs. Surdut further handled workers' compensation, property and casualty insurance, and public officials' liability insurance policies; as well as managed the Employee Assistance Program, loss prevention, and rewards programs; and participated in the Employee Safety Committee.

30.     Ms. Newman was appointed as the Town's Town Manager on or about July 3, 2023. For all relevant purposes, the titular change from Town Administrator to Town Manager was a distinction without a difference.

31.     Shortly into her tenure, Ms. Newman began to cut Mrs. Surdut out from performing the critical functions of her role.

32.     In September of 2023, Ms. Newman sought to address issues that had arisen with the Building Commissioner, Thomas Evers, whose department was not performing well in that it had fallen behind on work and appeared dysfunctional, in part due to the departure of the Assistant Building Inspector some six months earlier and the Town's attendant difficulty in filling that vacant position.

33.    Ms. Newman devised a plan, which entailed maintaining Mr. Evers at his current compensation level while demoting him to Assistant Building Inspector, then advertising instead the position of Building Commissioner at the maximum compensation step.

34.    However, instead of including Mrs. Surdut in the meeting with Mr. Evers, Ms. Newman kept Mrs. Surdut from attending, despite it being common practice for the Assistant Town Administrator/Manager to be present for and involved in such discussions.

35.    Ms. Newman then tasked Mrs. Surdut and Mr. Evers' supervisor, George Meservey, with identifying potential candidates to succeed Mr. Evers as Building Commissioner.

36.    Mrs. Surdut and Mr. Meservey identified Davis Walters, a Town resident who previously worked for the Town and was then serving as the Brewster Building Commissioner, and Ms. Newman asked Mrs. Surdut to reach out to Mr. Walters to gauge his interest in the position, as well as to advertise both the Building Commissioner and Assistant Building Inspector positions for hire.

37.    Mr. Walters eventually applied for the position and Ms. Newman again excluded Mrs. Surdut from the roughly one and one-half hourlong meeting in which she negotiated directly with Mr. Walters.

38.    Ms. Newman also instructed Mrs. Surdut not to share details regarding this situation, which had caused a great deal of confusion amongst Town employees and relevant union members who were in the dark about what was happening.

39.    Mrs. Surdut spoke with and confided in Susan Brown, President of the Manager's Union, about the uncomfortable position she found herself in with respect to this hiring and personnel situation.

40.     After Ms. Newman instructed Mrs. Surdut to draft a conditional offer for Mr. Walters, Mrs. Surdut suggested setting up a meeting with both unions in order to explain the Town's position and ensure transparency.

41.     Ms. Newman rejected Mrs. Surdut's suggestion and instructed Mrs. Surdut not to reach out to union leadership, stating, "Let them petition the Town, instead."

42.     This lack of transparency undermined the trust Mrs. Surdut had built over the previous six years with the unions and caused Mrs. Surdut to suffer significant mental distress.

43.     Furthermore, being excluded by Ms. Newman from performing critical functions of the Assistant Town Administrator/Manager role undermined Mrs. Surdut's position and caused her to suffer significant mental distress.

44.     Another similar situation arose in September of 2023 when Police Chief Scott MacDonald contacted Ms. Newman to discuss reclassifying two administrative titles in his office.

45.     In preparation for the meeting, Ms. Newman asked Mrs. Surdut to provide copies of certain job descriptions for consideration and to outline the reclassification process for both positions, as well as the possibility of removing the titles from the unions and creating new titles in the Personnel By-law to be approved at the Special Town Meeting scheduled for mid-October.

46.     Mrs. Surdut presumed she would be party to the meeting given her role in order to provide the institutional knowledge, history, background, and steps of the process, especially since Ms. Newman had only been with the Town for two months and was not yet fully familiarized with these facets.

47.     Furthermore, Mrs. Surdut presumed she would be party to the meeting because she would eventually be the person tasked with and responsible for drafting hiring paperwork for any new or reclassified employees, communicating with the unions, and coordinating with payroll.

48.     However, as Mrs. Surdut entered the meeting and was about to sit down, Ms. Newman again excluded Mrs. Surdut from this important meeting, instructing her to leave and close the door behind her.

49.     Being excluded from the meeting with Chief MacDonald caused a variety of challenges for Mrs. Surdut in finalizing the arrangements that were decided outside her presence, which included incorrect grades and/or titles, and caused Mrs. Surdut undue stress and pressure to complete the task within a reasonable timeline alongside managing her other responsibilities and deadlines.

50.     Prior to Ms. Newman's appointment, the Town did not have a formal Human Resources Department.

51.     Ms. Newman undertook the creation of a formal Human Resources Department at the behest of the Town Select Board.

52.     Ms. Newman approached Mrs. Surdut about creating a Human Resources Department before making any staffing changes and inquired if Mrs. Surdut desired to remain in the position of Assistant Town Manager or if she preferred to move into the newly-created Human Resources Department.

53.     Mrs. Surdut expressed her desire to work in Human Resources.

54.     Ms. Newman suggested that Mrs. Surdut should apply for the Human Resources **Coordinator** position, as opposed to Human Resources **Director**.

55.    Ms. Newman made this suggestion based on her assessment at the time that Mrs. Surdut lacked the necessary qualifications to become a Human Resources Director.

56.    Mrs. Surdut disagreed with Ms. Newman's assessment and, further, protested that the Coordinator designation would represent a demotion from her current position and payscale.

57.    Mrs. Surdut also noted to Ms. Newman that for more than five (5) years she occupied a role with nearly identical duties to those of any Human Resources Director's essential functions as compared to the surrounding towns.

58.    Ms. Newman eventually agreed and Mrs. Surdut transitioned into her role as the official Director of Human Resources on or about November 6, 2023.

59.    Ms. Newman excluded Mrs. Surdut from more meetings that were directly apposite to her role as Director of Human Resources, including meetings pertaining to the reorganization of the Town's Department of Public Works after Thomas Daley resigned as DPW Director.

60.    Instead of including Mrs. Surdut and following the usual process of advertising acting or temporary promotions to union members, Ms. Newman held one-on-one, private meetings with Public Works Manager Ron Trudeau to negotiate with him to stay on past his intended retirement in December of 2023.

61.    Despite it ultimately being Mrs. Surdut's responsibility to draft the side agreement with Mr. Trudeau that would keep him on past his retirement date, Ms. Newman excluded Mrs. Surdut from these critical discussions.

62.    Ms. Newman further cut Mrs. Surdut out from her clearly defined role by checking references for candidates to replace Mr. Daley herself.

63.     During this period, the Town's Finance Director, Cathy Doane, also resigned, and Ms. Newman excluded Mrs. Surdut from multiple meetings with the Town Accountant, Jennifer Mince, which pertained to managing the ensuing personnel challenges in that department.

64.     One of Mrs. Surdut's first official responsibilities in her official role as Human Resources Director was to advertise her former position as Assistant Town Administrator (reclassified as Assistant Town Manager) for hire.

65.     Ms. Newman embedded herself into this hiring process by e-mailing the Fire Chief, Geof Deering, and Mrs. Surdut a roadmap for exactly how she wanted the hiring process of the new Assistant Town Manager to proceed.

66.     Ms. Newman instructed that all applications should go directly to herself and set a deadline of November 15, 2023.

67.     Ms. Newman instructed Mrs. Surdut to include in the job description only general qualifications and contain as few specifications as possible.

68.     Ms. Newman instructed Mrs. Surdut to include the specific expertise sought, such as climate resiliency, economic development and planning, information technology and so forth, only in the advertising notice, as opposed to the job description.

69.     This plan of action ran counter to the accepted and usual practice of Town hiring and seemed designed, yet again, to cut Mrs. Surdut out from essential functions of her job.

70.     Normally, the job description contains the most detailed requirements as to the specific expertise and experience successful candidates must have.

71.     However, by omitting such specifics from the job description and including them only in the advertising notice, which does not formally govern hiring parameters, Ms. Newman was able to rig the hiring process to accommodate her handpicked candidate, Mark Reil.

72.     Mr. Reil and Ms. Newman previously worked together in the Town of Mendon for eight (8) years.

73.     During their time at Mendon, Mr. Reil was a Town Selectman and Ms. Newman was the Town Administrator.

74.     In 2016, Mr. Reil was Chairman of the Mendon Board of Selectmen when Ms. Newman received a substantial pay raise.

75.     Defendants made headlines in 2016 as rumors swirled suggesting that the raise was due to an alleged sexual relationship.

76.     Two investigations into the alleged sexual relationship between defendants were conducted.

77.     One investigation found there was no basis for the rumors.

78.     The other investigation concluded that defendants had placed themselves in situations that might be interpreted as a personal relationship.

79.     Ms. Newman asked Mrs. Surdut to draft and provide interview questions for Assistant Town Manager candidates.

80.     Ms. Newman had made similar requests of Mrs. Surdut for previous candidates to other postings.

81.     In the past, Mrs. Surdut had written exhaustive memos to aid in the hiring process, of which Ms. Newman had approved.

82.    But this time, for this position, with her preferred candidate already in mind, Ms. Newman wanted something entirely different.

83.    Mrs. Surdut had prepared a six (6) page list of questions into the areas of inquiry and import as requested by Ms. Newman.

84.    "We can skip the traditional set", Ms. Newman wrote on or about November 16, 2023 to Mrs. Surdut.

85.    "I want these interviews to be very targeted to get the information I want as fast as possible," Ms. Newman wrote on or about November 16, 2023 to Mrs. Surdut.

86.    Instead of having a detailed list replete with follow-up questions in order to assess the actual expertise of the candidates in the particular fields, Ms. Newman only wanted "one [question] for each of the areas above", namely, "Climate; Housing; Ecodevo; HR; Communications; Technology," Ms. Newman wrote on or about November 16, 2023 to Mrs. Surdut.

87.    Ms. Newman was not satisfied with Mrs. Surdut's efforts on this task.

88.    "We should set aside some time to talk about you getting a better understanding of the content you are producing as opposed to simply processing a request and putting things on paper," Ms. Newman wrote on or about November 17, 2023 to Mrs. Surdut.

89.    On or about November 21, 2023, Ms. Newman decided to hire Mr. Reil as Assistant Town Manager and made him a verbal offer the day following his interview.

90.    Ms. Newman tasked Mrs. Surdut with checking Mr. Reil's references and drafting a conditional offer for him to start on December 5, 2023.

91.    Ms. Newman instructed Mrs. Surdut to reach out only to the specific references Mr. Reil had listed on his application.

92.    Mrs. Surdut responded that she normally conducts background checks on prospective hires by contacting both current and past employers.

93.    However, Ms. Newman instructed her not to do so and, again, instructed Mrs. Surdut to reach out only to Mr. Reil's Plymouth reference, as well as his supervisor from his first job at a zoo.

94.    Mrs. Surdut was perplexed by this proscription on reference-checking because Mr. Reil had worked for the Departments of Public Health and Fish and Game, received a glowing letter of recommendation from a state senator, and previously served as a Selectman for another Town.

95.    Mr. Reil was formally hired and began in his role as Assistant Town Manager on December 5, 2023.

96.    During this period, Ms. Newman set meetings with department managers to discuss their needs, succession planning, and potential reclassifications necessary to reach departmental goals.

97.    Ms. Newman had tasked Mrs. Surdut with creating a Classification, Compensation, and Organizational study, to which end Mrs. Surdut had begun to communicate with the Collins Center and their consultant to schedule a preliminary meeting for sometime in January.

98.    In order to complete this study, it was essential that Mrs. Surdut be included in these meetings with department heads.

99.    However, again Ms. Newman excluded Mrs. Surdut from these meetings, despite Mrs. Surdut requesting that Molly Bates, the Executive Assistant, keep Mrs. Surdut informed of such meeting times so that she could add them to her calendar.

100. Ms. Bates later informed Mrs. Surdut that Ms. Newman desired to meet with the department managers individually without Mrs. Surdut.

101. Ms. Newman also communicated directly with the consultant from the Collins Center without including Mrs. Surdut, which caused confusion and further undermined Mrs. Surdut's role and tasks.

102. On December 5, 2023, Ms. Newman held a closed door meeting with several of Mrs. Surdut's colleagues.

103. On information and belief, Ms. Newman stated substantially the following regarding Mrs. Surdut during this closed door meeting on December 5, 2023: "Fucking Liana—how she got to this level is beyond me. People like her don't get to this level. But she's not going to be here for much longer."

104. On or about December 7, 2023, Mrs. Surdut raised her concerns about the increasing hostility which she encountered in her working environment from Ms. Newman to Andrea Reed, the Clerk of the Town Select Board.

105. Later, a firsthand witness disclosed to Mrs. Surdut that Ms. Newman revealed to him in casual conversation at a local bar on or about December 15, 2023, Ms. Newman's intention to "get rid of [Mrs. Surdut]" because she is "unvaccinated and a right-wing extremist", and Ms. Newman "could not have someone like that on her team."

106. Mr. Reil was sitting next to Ms. Newman when she made these remarks.

107. On December 19, 2023, Mrs. Surdut met with the Town's labor counsel and Mr. Reil.

108. After the Town's labor counsel left the meeting, Mr. Reil asked Mrs. Surdut to stay.

109.    Mr. Reil proceeded to state that Ms. Newman was "not happy with documents [Mrs. Surdut] had produced lately."

110.    Mr. Reil disclosed, specifically, that Ms. Newman had been unhappy with Mrs. Surdut's performance with respect to the questions she had prepared for the Assistant Town Manager interviews and with the background/reference check process particular to his own hiring.

111.    Mr. Reil asked Mrs. Surdut to e-mail him the format of her reference check questions, as well as her job description as Director of Human Resources, so that he could set clear expectations and work on "the plan" for her in order that "they" could "set [Mrs. Surdut] up for success."

112.    Mrs. Surdut was concerned that Mr. Reil, now just two weeks into his tenure as Assistant Town Manager, was critiquing and assessing her job performance specifically as it related to his own hiring, and furthermore Mr. Reil was not yet appointed as Ms. Newman's designee.

113.    Mrs. Surdut was further concerned and aghast that Mr. Reil was taking these (and subsequent, as detailed below) adverse actions against Mrs. Surdut despite not being appointed by the Town Select Board to act in the absence of the Town Manager.

114.    This was the first instance, aside from Ms. Newman's emails on November 16-17, 2023, in which Mrs. Surdut was formally made aware that her job performance was anything but satisfactory.

115.    The next day, December 20, 2023, Mr. Reil e-mailed Mrs. Surdut requesting a 10:00 AM appointment in her office.

116.    The meeting began cordially enough with a discussion about various personnel matters.

117.    Roughly thirty minutes into their meeting, Mr. Reil's demeanor and tone markedly changed, when he stated that Ms. Newman had "found out" the night before that Mrs. Surdut had shared "someone's" medical information with another employee.

118.    Mr. Reil demanded that Mrs. Surdut answer this allegation.

119.    Mrs. Surdut responded that she was astonished and had no idea what Mr. Reil was referring to.

120.    Mr. Reil then stated very slowly, "You don't remember talking to Jen [Mince] about Greta[ Avery]'s medical info?"

121.    Mrs. Surdut then described what she said to Ms. Mince regarding Ms. Avery and explained why she said it.

122.    Plaintiff explained that Ms. Avery, the subject of Mrs. Surdut's alleged HIPAA violation, freely shared details regarding her medical status and updates/changes thereto with colleagues.

123.    Plaintiff explained that Ms. Avery's medical status and issues were, accordingly, well known amongst her colleagues, including Ms. Mince, and ***not regarded as sensitive or privileged by Ms. Avery***.

124.    Plaintiff explained that Ms. Mince, who reported Mrs. Surdut's alleged incidental disclosure/use of Ms. Avery's medical status to Ms. Newman, was already fully apprised of the details of Ms. Avery's condition prior to her conversation with Mrs. Surdut when the alleged disclosure/use of sensitive health information occurred.

125.    Mr. Reil, apparently unpersuaded, replied, "We can't afford to have you share such highly confidential matters in your role as Human Resources Director."

126.    Mr. Reil said that he "knows Kim [Newman]" and knows what she is going to do: "launch a big investigation".

127.    Mr. Reil stated that he and Ms. Newman would like to "spare" Mrs. Surdut from the humiliation of such an investigation pursuant to the Health Insurance Portability and Accountability Act ("HIPAA") by allowing her to resign.

128.    Mr. Reil told Mrs. Surdut to go home, think about it, and give him a decision soon so he knows "how to proceed".

129.    Mrs. Surdut asked if she was being placed on Administrative Leave.

130.    Mr. Reil stated she was not.

131.    At this point, Mrs. Surdut felt ill and consumed by anxiety over the prospect of losing her nearly two decade career.

132.    How Mr. Reil presented the "complaint" to her was extremely deviant from the norm and the Town personnel by-laws in that he sprung it on her—verbally and not, given the gravity of the accusation, in a formal writing or notice—at the tail-end of a generic meeting in which they discussed other work matters.

133.    Mrs. Surdut was beset by confusion, panic, and shock.

134.    Mrs. Surdut immediately made an appointment with her physician who eventually, on or about January 2, 2024, with an effective date of December 29, 2023, ordered Mrs. Surdut to take a leave of absence, pursuant to the Family Medical Leave Act ("FMLA"), from work due to the sudden, crushing toll that this episode with Mr. Reil, combined with Ms. Newman's acts, words, and deeds over the preceding months, were cumulatively taking on her physical and mental health.

135.   Mrs. Surdut, previously a fit, healthy, happy, and unmedicated individual in all material respects, was suddenly experiencing heart palpitations and was also prescribed medications for anxiety, sleep, and depression as a result of the rapid change in circumstances with respect to her position with the Town.

136.   Mrs. Surdut later learned while on FMLA leave that the same day that Mr. Reil had ambushed Mrs. Surdut with the so-called HIPAA complaint and investigation, December 20, 2023, Ms. Newman had approached another third-party regarding Mrs. Surdut.

137.   In this conversation, Ms. Newman stated that she planned to fire Mrs. Surdut and was open to offering this third-party Mrs. Surdut's human resources responsibilities.

138.   In front of this third-party and another colleague, Ms. Newman additionally stated, unequivocally, that Mrs. Surdut had violated HIPAA.

139.   On December 21, 2023, plaintiff wrote Mr. Reil an e-mail stating that she was taking a personal day in order to seek legal advice regarding the HIPAA violation he had alleged against her.

140.   Mr. Reil responded by e-mail to plaintiff on December 21, 2023 and suggested to schedule a time the following week in order "to meet to begin the investigation process." Mr. Reil stated in this e-mail that because Ms. Newman would be out of the office the following week, the Town of Orleans Police Chief would "sit[] in simply as a witness and not active participant."

141.   Plaintiff was intimidated by the inclusion of the police chief in the proposed meeting as in all her years working for the Town, particularly in the human resources/personnel domain, the police chief was never included or asked to sit in as a witness in any similar such investigation.

142.    On December 26, 2023, plaintiff notified Mr. Reil by e-mail that the HIPAA violation allegation and looming investigation had caused her mental duress for which she was seeking medical assistance and legal counsel.

143.    On or about December 26, 2023, Mr. Reil responded by e-mail and suggested that plaintiff might be eligible for leave under the FMLA. Mr. Reil attached FMLA paperwork to the e-mail and also stated that the parties would schedule the investigation interview for the first week of January, instead.

144.    Between December 27, 2023 and December 29, 2023, Mr. Reil sent plaintiff multiple e-mails requesting updates as to plaintiff's availability for the investigation interview and whether she had been able to see her healthcare provider regarding the FMLA application. Plaintiff responded that she was working on getting an appointment.

145.    On January 1, 2024, plaintiff e-mailed Mr. Reil a medical note from her healthcare provider containing the FMLA certification and a flu diagnosis.

146.    On January 2, 2024, Mr. Reil e-mailed plaintiff with questions regarding the specifics contained in the medical note from plaintiff's healthcare provider.

147.    On January 2, 2024, plaintiff replied to Mr. Reil by e-mail stating that her healthcare provider had confirmed her full incapacitation from January 2, 2024 through April 1, 2024 and that plaintiff would require intermittent leave thereafter, approximately 1 to 2 days per month. Plaintiff further wrote that she had left word with her healthcare provider seeking clarification as to certain elements of the FMLA paperwork, but had not yet heard back. Finally, plaintiff wrote that given her current physical and mental condition, she was unable to return to work.

148.    On January 3, 2024, Mr. Reil again e-mailed plaintiff asking for an update from plaintiff's healthcare provider, to which plaintiff shortly thereafter responded that she had not yet heard back but did have an appointment scheduled on January 8, 2024, so she would have more information then. Plaintiff informed Mr. Reil that her entire family had become sick with the flu.

149.    Later that day, on January 3, 2024, Mr. Reil informed plaintiff that he had disabled her access to her Town e-mail account.

150.    On January 4, 2024, Mr. Reil wrote Mrs. Surdut at her personal e-mail again seeking clarity on the FMLA certification provided by plaintiff's healthcare provider and informing plaintiff that "we anticipate [plaintiff's FMLA leave] will expire on March 26th should [she] be out continuously" and again stated that "we still need to schedule a time for an interview in regards to the pending investigation", asking "[c]ould we maybe schedule a time next week via zoom".

151.    On January 5, 2024, plaintiff responded by e-mail to Mr. Reil that her healthcare provider had initiated her FMLA leave starting January 2, 2024, "acknowledging the need for a recovery period from my physical illness (flu) for at least 5 days, which would have covered the absence prior to" January 2, 2024. Plaintiff continued, "I plan to seek clarification on the medical note and details regarding incapacity during my meeting with her and follow up with you as soon as practic[able]. Unfortunately, due to the severe distress caused by this situation, I am not well enough to attend an in-person or Zoom interview. However, I would be happy to provide written responses to any questions you may have in a prompt manner."

152.    On January 8, 2024, Mr. Reil and plaintiff again corresponded by e-mail regarding the FMLA details and exchanged relevant paperwork. Additionally, plaintiff informed Mr. Reil that

she had been diagnosed with pneumonia and prescribed antibiotics. Undeterred, Mr. Reil continued to contact both plaintiff and her healthcare provider's office to provide a revised certification, which necessitated plaintiff spending more than four hours that day in her healthcare provider's office while sick with pneumonia working with office staff to arrange for Mr. Reil to be provided with the paperwork he sought.

153.    On January 23, 2024, Mr. Reil wrote Mrs. Surdut at her personal email with three questions pertaining to the "pending investigation" and demanded Mrs. Surdut respond by Friday, January 26, 2024, at noon.

154.    Mrs. Surdut ultimately declined to answer these questions while she was on FMLA leave.

155.    As of this date, on information and belief, neither Mr. Reil, Ms. Newman, nor any Town investigator or representative have ever attempted to contact Ms. Avery either to inquire about the circumstances of the alleged unauthorized disclosure/use or to advise her that her health information had been disclosed.

## CLAIMS

### Count One

### Hostile Work Environment

156.    Plaintiff realleges and incorporates herein by reference the factual allegations contained in each and every other paragraph of this Complaint.

157.    Plaintiff, for more than seventeen (17) years, worked for the Town of Orleans.

158.    Plaintiff is a member of at least three (3) protected classes: national origin (born in Czech Republic); religion (devout Christian); and sex (female).

159.    In the six (6) months that she worked for and with Ms. Newman as Town Manager, plaintiff experienced a work environment that was pervaded by harassment, abuse, and disparate work assignments, which resulted in plaintiff's intimidation, humiliation, and stigmatization, both objectively and subjectively.

160.    The Town of Orleans work environment was pervaded by harassment and/or abuse as exemplified by Ms. Newman viciously smearing Mrs. Surdut to third-party colleagues and others on multiple separate occasions, and the content of Ms. Newman's vile remarks can fairly be traced to animus based on Mrs. Surdut's membership in protected classes.

161.    Mrs. Surdut was humiliated by Ms. Newman's callous conversations behind her back to third-party colleagues, in which Ms. Newman ridiculed and called into question Mrs. Surdut's proficiency and competence as a nearly two-decade employee of the town.

162.    Mrs. Surdut is unaware of any instances in which Ms. Newman questioned the competence of proficiency of native English speakers.

163.    Mrs. Surdut is aware of Ms. Newman questioning the competence of and terminating one of her colleagues who was also born in Eastern Europe and naturalized as an United States citizen.

164.    Mrs. Surdut therefore presumes that Ms. Newman's derogatory commentary on December 5, 2023 impugning Mrs. Surdut's qualities as an employee, was motivated at least in part by animus against Mrs. Surdut's national origin.

165.    Ms. Newman further stigmatized and derided Mrs. Surdut for her personal medical decisions on December 15, 2023, when she told a third-party that Mrs. Surdut was unvaccinated against COVID-19 and a political extremist. Mrs. Surdut has not received any COVID-19

vaccinations because all of the available COVID-19 vaccinations trace their origin or manufacture to fetal cell lines, which are derived from aborted fetuses. Plaintiff's faith and sincerely held beliefs oppose abortion. Accordingly, the conclusion is inescapable that Ms. Newman's slurs against Mrs. Surdut were motivated at least in part by anti-Christian animus.

166.    Subjectively, Mrs. Surdut was aware of Ms. Newman's vicious smears.

167.    On December 20, 2023, Mr. Reil attempted to coerce Mrs. Surdut into resigning based on a threat of investigation for a HIPAA violation, which constitutes an act of intimidation.

168.    Mrs. Surdut subjectively perceived Mr. Reil's remark that Ms. Newman would "launch a big investigation" as a threat emanating directly from her supervisor.

169.    A reasonable person would objectively feel intimidated by Mr. Reil's threatened investigation, and a reasonable person would objectively feel humiliated and demeaned by embarrassing and derogatory comments such as those made by Ms. Newman regarding Mrs. Surdut.

170.    Individually and in their cumulative totality, any reasonable person would perceive the work environment Mrs. Surdut suffered through as sufficiently severe and/or pervasive as to constitute a hostile and abusive work environment.

171.    Moreover, individually and in their cumulative totality, any reasonable person would perceive the disparate work assignments as exemplified by Mrs. Surdut being serially excluded from a number of meetings that were clearly germane to her job description and responsibilities as undermining her position with the Town and were sufficiently severe and/or pervasive as to constitute further hostility and/or abuse in the workplace, which also interfered with plaintiff's work performance.

172.    Subjectively, Mrs. Surdut perceived the disparate work assignments and her serial exclusion from such meetings as directly undermining her position with the Town and amongst her colleagues and suffered severe stress as a result.

173.    Mrs. Surdut has suffered from depression, anxiety, and other severe, lasting health challenges as a result of the hostile work environment she endured as a result of Ms. Newman and Mr. Reil, none of which conditions existed prior to their wrongful actions.

174.    As a result of the hostile work environment herein described, Mrs. Surdut suffered a mental health breakdown, began to experience heart palpitations now diagnosed as cardiac arrhythmia, was prescribed medications, and forced to apply for leave pursuant to the FMLA.

## Count Two

### Constructive Discharge

175.    Plaintiff realleges and incorporates herein by reference the factual allegations contained in each and every other paragraph of this Complaint.

176.    Ms. Newman and Mr. Reil's conduct, in creating a hostile work environment (as described in Count One, *supra*, and incorporated by reference herein), effectively forced Mrs. Surdut to resign.

177.    Ms. Newman and Mr. Reil created working conditions for Mrs. Surdut that were so difficult and/or unpleasant that a reasonable person in her shoes would feel compelled to resign.

178.    Mrs. Surdut could not "stay on the job" while seeking redress without continuing to suffer from the intolerable hostility and abuse caused by Ms. Newman and Mr. Reil.

179.    Based on the totality of Mrs. Surdut's experience, it is clear that the harassment and abuse she endured would have continued unabated had she remained on the job and returned to work following the expiry of her leave under the FMLA.

180.    In light of the stigmatizing and humiliating verbal abuse of Ms. Newman and Mr. Reil's underhanded attempt on December 20, 2023 to orchestrate Mrs. Surdut's voluntary resignation without any due process—an act which can only have been pursued at the direction or with the express consent of Ms. Newman—it is clear that Mrs. Surdut is left with virtually no alternative than to consider herself constructively discharged.

181.    In light of Mrs. Surdut being systematically undermined in her position by Ms. Newman who serially excluded plaintiff from meetings where her attendance was critical, Mrs. Surdut is left with virtually no alternative than to consider herself constructively discharged.

182.    The totality of Mrs. Surdut's experiences since Ms. Newman became Town Manager and brought Mr. Reil into his role as Assistant Town Manager has riven Mrs. Surdut's mental health and caused her to endure severe and lasting health challenges, which her treating physicians and medical team directly and unequivocally attribute to Mrs. Surdut's on-the-job experiences and the cumulative abuse and hostility she suffered by the acts, words, and deeds of both Ms. Newman and Mr. Reil.

## **Count Three**

### **(As to Ms. Newman, only)**

**Political Affiliation Discrimination in Violation of the First Amendment to the United States Constitution**

183.    Plaintiff realleges and incorporates herein by reference the factual allegations contained in each and every other paragraph of this Complaint.

184.    The First Amendment of the United States Constitution is applicable against the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and through 42 U.S.C. § 1983.

185.    Plaintiff is a long-serving municipal employee of the Town of Orleans, which is a public employer, in a position that does not require political affiliation.

186.    The Orleans Town Code, ch. 40, § 1-2-5, assures fair treatment of all employees without regard to political affiliation.

187.    The Orleans Town Code, ch. 40, § 1-2-6 protects all employees from coercion for partisan political purposes.

188.    Over the course of her tenure as an Orleans Town employee, plaintiff did engage in constitutionally protected conduct when she occasionally discussed her political viewpoints and affiliation with colleagues.

189.    Plaintiff considers herself to be a conservative and represented her conservative political and religious views in various conversations amongst colleagues over the years.

190.    When Ms. Newman stated that she intended to "get rid of [Mrs. Surdut]" because Mrs. Surdut is "unvaccinated and a right-wing extremist", and that Ms. Newman "could not have someone like that on her team", it is manifest that Mrs. Surdut's political orientation is not only a substantial or motivating factor, but in fact *the* principal factor driving Ms. Newman's animus towards and adverse personnel decisions against Mrs. Surdut.

191.    Based on Mrs. Surdut's constructive discharge and the hostile work environment she subjectively and objectively suffered under, including but not limited to Mr. Reil's threat to investigate Mrs. Surdut for a HIPAA violation if she did not voluntarily resign, the cumulative totality of those circumstances constitute one adverse, governmental employment decision, and Mrs. Surdut was discriminated against based on her political affiliation in violation of the First Amendment.

### Count Four

### (As to Ms. Newman, only)

### Intentional Interference with Advantageous Relations

192.    Plaintiff realleges and incorporates herein by reference the factual allegations contained in each and every other paragraph of this Complaint.

193.    Mrs. Surdut had an advantageous employment relationship with the Town of Orleans over the course of her more than seventeen (17) year tenure with the Town.

194.    Mrs. Surdut enjoyed her work for the vast majority of her employ; she was friendly and friends with many of her colleagues; she rose through the ranks and served as Assistant Town Administrator and, recently, Director of Human Resources, and was, accordingly, remunerated well in both pay and benefits, including sick leave, vacation time, personal time, and subsidized health insurance.

195.    Ms. Newman and Mr. Reil interfered with Mrs. Surdut's advantageous employment relationship by creating a hostile work environment (as described in Count One, *supra*, and incorporated by reference herein) that amounted to constructive discharge (as described in Count Two, *supra*, and incorporated by reference herein).

196.    Mr. Reil's actions on December 20, 2023, in attempting to engineer Mrs. Surdut's voluntary resignation, are attributable to Ms. Newman pursuant to the doctrine of *respondeat superior*.

197.    In light of the political affiliation discrimination against Mrs. Surdut (as described in <u>Count Three</u>, *supra*, and incorporated by reference herein), actual malice is shown on the part of Ms. Newman against plaintiff.

198.    Beyond her constructive discharge, Mrs. Surdut further has been harmed by Mr. Reil and Ms. Newman's actions in that plaintiff has exhausted all of her accrued vacation time, sick leave, and personal time since her FMLA leave expired on or about May 3, 2024.

**<u>Count Five</u>**

**(As to Ms. Newman, only)**

**Breach of Implied Covenant of Good Faith and Fair Dealing**

199.    Plaintiff realleges and incorporates herein by reference the factual allegations contained in each and every other paragraph of this Complaint.

200.    The covenant of good faith and fair dealing is implicit in all Massachusetts contracts, including contracts for employment.

201.    Mrs. Surdut, by virtue of her employment with the Town of Orleans, was protected by the implied covenant and owed, therefore, a duty by Ms. Newman, her supervisor, to deal with her fairly and in good faith.

202.    Ms. Newman acted in a fashion that had the effect of destroying and injuring plaintiff's rights to receive the fruits of her contract with the Town of Orleans.

203.    Massachusetts law recognizes a breach of the implied covenant of good faith and fair dealing in two limited circumstances involving termination of at-will employees: (1) when an employer terminates an employee to avoid payment of future expected compensation for past services or expected benefits…or (2) *when employment was terminated contrary to a clearly established public policy*.

204.    The facts supporting Counts 1-3 of this Complaint (as described in Counts One, Two, and Three, *supra*, and incorporated by reference herein) likewise demonstrate that Ms. Newman breached the implied covenant of good faith and fair dealing in ways that violated a clearly established public policy.

205.    Ms. Newman, through Mr. Reil, targeted Mrs. Surdut for termination via an orchestrated voluntary resignation plot that was entirely pretextual.

206.    Ms. Newman furthermore unconstitutionally discriminated against Mrs. Surdut on the basis of her political affiliation and wantonly disseminated medical facts of a private nature to third parties, which actions are clearly violative of established public policies.

207.    Mrs. Surdut reasonably anticipated continuing her favorable employment with the Town until her age of retirement.

208.    Plaintiff's employment conferred important income, health benefits, vacation time, leave policies, and pension.

209.    Ms. Newman's actions have had the effect of destroying and/or injuring Mrs. Surdut's rights to receive these enumerated fruits of the contract, and others.

### Count Six

### (As to Ms. Newman, only)

## Intentional Infliction of Emotional Distress

210.  Plaintiff realleges and incorporates herein by reference the factual allegations contained in each and every other paragraph of this Complaint.

211.  Ms. Newman knew, or should have known, that by disparaging Mrs. Surdut's job performance, excluding plaintiff from meetings which her position required she attend, ridiculing plaintiff's political beliefs, exposing her medical status, and causing or allowing Mr. Reil to attempt to orchestrate plaintiff's voluntary resignation, that such conduct and acts would cause plaintiff emotional distress.

212.  Ms. Newman's conduct, as outlined and described herein, was extreme and outrageous.

213.  Ms. Newman told multiple third parties that she intended, one way or another, to get rid of Mrs. Surdut.

214.  Ms. Newman identified the forbidden bases for her ire and vitriol towards Mrs. Surdut: political affiliation and medical history, in violation of the clearly established policy of the Town of Orleans as described in Orleans Town Code, ch. 40, § 1-2-5, not to discriminate against employees on the basis of their political affiliation, national origin, creed, or any other non-merit factor, and Ms. Newman acted without regard for Mrs. Surdut's privacy and constitutional rights.

215.  Ms. Newman acted entirely without privilege, and in extreme and outrageous fashion, when she advanced a scheme against a Town employee, plaintiff, to secure her voluntary resignation under threat of a pretextual investigation when unconstitutional animus against plaintiff is manifest on the contemporaneous record.

Date Filed 8/2/2024 1:21 PM
Superior Court - Barnstable
Docket Number

216.    Mrs. Surdut did in fact suffer documented, severe emotional and mental distress, as well as detrimental impacts to her physical health, as a result of these occurrences alleged and described herein.

### Count Seven

**(As to Ms. Newman, only)**

**Defamation *Per Se***

217.    Plaintiff realleges and incorporates herein by reference the factual allegations contained in each and every other paragraph of this Complaint.

218.    Plaintiff has for many years enjoyed an excellent reputation as a private citizen and as a career municipal and human resources professional who served the Town of Orleans with distinction for over seventeen (17) years.

219.    On or about December 20, 2024, Ms. Newman maliciously (and/or recklessly) and with intent to cause it to be believed that this plaintiff stridently deviated from and violated the Health Insurance Portability and Accountability Act by disclosing privileged and sensitive of one colleague in conversations with another colleague, and in order to injure the plaintiff and deprive her of the respect, confidence, and esteem particularly and peculiarly essential to the plaintiff's profession as a human resources professional, and contriving and intending to deprive the plaintiff of her good name, reputation, and esteem of her colleagues and the public, and to bring her into disastrous scandal, hatred, ridicule, and disgrace, and professional disrepute with professional associates, friends, and the public in general, and to hold plaintiff up to public scorn, contempt, hatred, ridicule, and disgrace, did, with actual malice and/or reckless disregard for the

truth, slander and defame Mrs. Surdut by stating to one or more of plaintiff's colleagues that plaintiff violated HIPAA.

220.    Absent the benefit of any formal investigation, without speaking to the interested party whose protected health information plaintiff ostensibly disclosed, and without issuing any written notice to plaintiff that a complaint had been made and was being reviewed, Ms. Newman stated to at least two colleagues the unequivocal assertion of fact—as opposed to her opinion— that "[Mrs. Surdut] violated HIPAA".

221.    A substantiated charge for violating HIPAA is disastrous to the reputation of a human resources professional, and, furthermore, violating the HIPAA privacy rule in question provides for civil and criminal penalties against the person who improperly discloses protected health information, and thus is defamatory *per se*.

222.    By reason of the malicious and/or reckless slander and dissemination of the defamatory remark given by Ms. Newman in her official capacity as Town manager, the plaintiff has been deprived in the Commonwealth of Massachusetts of the public confidence which she had enjoyed as a private citizen and as a human resources professional; has suffered embarrassment, humiliation, and mental agony; and has been held in contempt, hatred, ridicule, calumny, and distrust.

223.    Any privilege Ms. Newman may have enjoyed as Town Manager and plaintiff's supervisor was abused and lost by the maliciousness and/or recklessness with which she slandered and defamed Mrs. Surdut by falsely representing plaintiff's actions and the circumstances surrounding her actions when Ms. Newman had or should have had actual knowledge that Mrs. Surdut acted consistently with HIPAA policy and discussed a matter of

public knowledge with another colleague, rather than disclosing a privileged, sensitive medical fact, as a result of these occurrences alleged and described herein.

## Count Eight

### (As to all defendants)

### Deprivation of Liberty and Property Without Due Process of Law in Violation of Articles 1, 10, and 12 of the Massachusetts Declaration of Rights

224.     Plaintiff realleges and incorporates herein by reference the factual allegations contained in each and every other paragraph of this Complaint.

225.     Articles 1, 10, and 12 of the Declaration of Rights of the Massachusetts Constitution mandate that deprivations of life, liberty, or property be implemented in a fair manner.

226.     As a public employer, the Town of Orleans is constrained by its own bylaws, code, and charter, and the state and federal constitutions, as is Ms. Newman as an executive of the Town and Mr. Reil as an employee of same.

227.     Plaintiff had a cognizable property interest in her employ with the Town of Orleans, based on her more than seventeen (17) year history in working as a public employee for the Town; the important benefits her employment with the Town conferred on her, including but not limited to vacation time, sick time, health insurance, and personal time; and her status as a long-serving human resources professional and position as Director of Human Resources.

228.     Plaintiff had a sufficient expectancy of continued employment as to constitute a property interest because plaintiff's employment could not be terminated by defendants, nor could defendants constructively discharge plaintiff as alleged herein, without first observing the clearly

described procedures for disciplinary action that are specified in Chapter 24 of the Orleans Town Code.

229.    Defendants disregarded plaintiff's procedural due with respect to disciplinary action under and as specified in ch. 24-2 of the Orleans Town Code when Mr. Reil orally notified plaintiff of the looming investigation of her alleged HIPAA violation because Mr. Reil was not yet at this time Mrs. Newman's official "designee" and, furthermore, he did not offer plaintiff any "assistance in correcting her deficiency".

230.    Rather, Mr. Reil instructed plaintiff to leave work in order to consider whether she wanted to voluntarily resign in order to spare herself the indignity of an investigation by Ms. Newman into her alleged HIPAA violation.

231.    Defendants disregarded the procedure specified in ch. 24-2-2 of the Orleans Town Code by failing to issue plaintiff a written reprimand, which would have been appropriate based on the gravity of plaintiff's alleged misconduct, that ought to have included "the charge; the specific behavior and the dates of the behavior (where appropriate) that support [] the charge; the warning that continuance of this behavior will result in more severe disciplinary action; an offer of assistance in correcting the behavior; any circumstances affecting the severity of the discipline; and advice on right of appeal".

232.    The fundamental requisite of due process is an opportunity to be heard at a meaningful time and in a meaningful manner, which was denied to plaintiff based on the failure of defendants to strictly adhere to the protocols and procedures for notifying her in writing of her alleged transgression and defendants' complete failure to adequately and subsequently investigate her alleged transgression by never contacting the party whose protected health

information plaintiff had allegedly wrongfully disclosed in order to determine whether there was merit to plaintiff's contention that the supposedly protected information was in fact well and publicly known.

233.    The fundamental requisites of due process were further denied to plaintiff in violation of the Orleans Town Code and Massachusetts Declaration of Rights by Ms. Newman's defamatory remarks to plaintiff's colleagues, in which she conclusorily informed them that plaintiff had violated HIPAA, thus stigmatizing plaintiff outright and further stigmatizing plaintiff in denial of her rights under the Orleans Town Code to receive written notice of the allegations against her and under the Massachusetts Declaration of Rights to be given such notice and a meaningful opportunity to controvert such allegations.

234.    Defendants' denial of plaintiff's procedural due process rights contributed to her constructive discharge and inflicted lasting damage to her reputation as a human resources professional, in which plaintiff had a liberty and property interest due to her years of professional labor, education, and toil in building and maintaining same.

235.    Since her constructive discharge, plaintiff has unsuccessfully applied for a number of similar human resources positions with other municipalities and organizations, and despite her stellar professional and educational credentials has yet to receive a single interview, which strongly suggests defendants' acts and/or deeds have poisoned the well and wrongfully harmed plaintiff's employment prospects.

## **Count Nine**

### **(As to all defendants)**

### **Deprivation of Liberty and Property Without Due Process of Law**

**in Violation of the Fourteenth Amendment to the U.S. Constitution as Incorporated Against the States through 42 U.S.C. § 1983**

236.    Plaintiff realleges and incorporates herein by reference the factual allegations contained in each and every other paragraph of this Complaint.

237.    As a public employer, the Town of Orleans is constrained by its own bylaws, code, and charter, and the state and federal constitutions, as is Ms. Newman as an executive of the Town and Mr. Reil as an employee of same.

238.    The Fourteenth Amendment to the United States Constitution mandates that in every case where a protected property interest is at stake, reasonable notice and a meaningful opportunity to be heard must be given.

239.    Plaintiff had a cognizable property interest in her employ with the Town of Orleans, based on her more than seventeen (17) year history in working as a public employee for the Town; the important benefits her employment with the Town conferred on her, including but not limited to vacation time, sick time, health insurance, and personal time; and her status as a long-serving human resources professional and position as Director of Human Resources.

240.    Plaintiff had a sufficient expectancy of continued employment as to constitute a property interest because plaintiff's employment could not be terminated by defendants, nor could defendants constructively discharge plaintiff as alleged herein, without first observing the clearly described procedures for disciplinary action that are specified in Chapter 24 of the Orleans Town Code.

241.    Defendants disregarded plaintiff's procedural due with respect to disciplinary action under and as specified in ch. 24-2 of the Orleans Town Code when Mr. Reil orally notified

plaintiff of the looming investigation of her alleged HIPAA violation because Mr. Reil was not yet at this time Mrs. Newman's official "designee" and, furthermore, he did not offer plaintiff any "assistance in correcting her deficiency".

242.    Rather, Mr. Reil instructed plaintiff to leave work in order to consider whether she wanted to voluntarily resign in order to spare herself the indignity of an investigation by Ms. Newman into her alleged HIPAA violation.

243.    Defendants disregarded the procedure specified in ch. 24-2-2 of the Orleans Town Code by failing to issue plaintiff a written reprimand, which would have been appropriate based on the gravity of plaintiff's alleged misconduct, that ought to have included "the charge; the specific behavior and the dates of the behavior (where appropriate) that support [] the charge; the warning that continuance of this behavior will result in more severe disciplinary action; an offer of assistance in correcting the behavior; any circumstances affecting the severity of the discipline; and advice on right of appeal".

244.    The fundamental requisite of due process is an opportunity to be heard at a meaningful time and in a meaningful manner, which was denied to plaintiff based on the failure of defendants to strictly adhere to the protocols and procedures for notifying her in writing of her alleged transgression and defendants' complete failure to adequately and subsequently investigate her alleged transgression by never contacting the party whose protected health information plaintiff had allegedly wrongfully disclosed in order to determine whether there was merit to plaintiff's contention that the supposedly protected information was in fact well and publicly known.

245.    The fundamental requisites of due process were further denied to plaintiff in violation of the Orleans Town Code and the Fourteenth Amendment to the United States Constitution by Ms. Newman's defamatory remarks to plaintiff's colleagues, in which she conclusorily informed them that plaintiff had violated HIPAA, thus stigmatizing and defaming plaintiff outright and further stigmatizing plaintiff in denial of her rights under the Orleans Town Code to receive written notice of the allegations against her and under the United States Constitution to be given such notice and a meaningful opportunity to controvert such allegations.

246.    Defendants' denial of plaintiff's procedural due process rights contributed to her constructive discharge and inflicted lasting damage to her reputation as a human resources professional, in which plaintiff had a liberty and property interest due to her years of professional labor, education, and toil in building and maintaining same.

247.    Since her constructive discharge, plaintiff has unsuccessfully applied for a number of similar human resources positions with other municipalities and organizations, and despite her stellar professional and educational credentials has yet to receive a single interview, which strongly suggests defendants' acts and/or deeds have poisoned the well and wrongfully harmed plaintiff's employment prospects.

### Count Ten

**(As to all defendants)**

**Interference with the Family and Medical Leave Act
in Violation of 29 U.S.C. § 2615**

248.    Plaintiff realleges and incorporates herein by reference the factual allegations contained in each and every other paragraph of this Complaint.

249.    The Family and Medical Leave Act states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title."

250.    Plaintiff was eligible for the FMLA's protections and clearly meets the 12 month employment duration requirements of the FMLA as a long-serving employee of the Town of Orleans for more than 17 years.

251.    The Town of Orleans has sufficient employees in order to be covered by the FMLA and, indeed, Mr. Reil confirmed that the Town is covered by the FMLA when he informed plaintiff on or about December 26, 2023 that she may be eligible for leave under the FMLA.

252.    Plaintiff was entitled to leave under the FMLA because her healthcare provider submitted written documentation confirming that she was suffering from a "serious health condition that ma[de] [her] unable to perform the functions of [her] position" as required by 29 U.S.C. § 2612(a)(1)(D). Plaintiff was prescribed medications and a course of therapy, which she continues as of this date, in order to address the serious mental health conditions that had arisen.

253.    Plaintiff gave notice to defendants of her intention to take leave under the FMLA on or about January 1, 2024.

254.    Plaintiff further informed Mr. Reil that the nature of the serious health condition, which rendered her unable to perform the essential functions of her position, was mental health strain and duress resulting from the alleged HIPAA violation and looming investigation.

255.    Plaintiff's rights under the FMLA to which she was entitled were denied and interfered with by Mr. Reil's incessant attempts throughout the month of January of 2024 to conduct an

investigation into the very allegations that caused plaintiff to need to seek leave under the FMLA in the first place.

256.    The interference was intentional and not simply routine requests for status updates or the like to an employee on leave, given that Mr. Reil repeatedly sought a substantive interview of plaintiff that he consistently styled as an investigation into her alleged wrongdoing.

257.    The repeated requests to conduct an investigative interview of plaintiff while she was currently suffering from a mental health crisis on a protected FMLA leave not only constituted violative interference but further exacerbated plaintiff's physical state, causing her to develop heart palpitations that have since been diagnosed as a cardiac arrhythmia, a condition from which she never previously suffered, and further worsened her mental health status, necessitating greater and more treatments, medications, and therapy.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests a trial by jury and asks that this Honorable Court award plaintiff her damages, order defendants to pay plaintiff punitive damages, award plaintiff her costs, expenses and reasonable attorney's fees pursuant to applicable law, and grant such other relief as this Court deems just and appropriate.

## VERIFICATION

I, LIANA SURDUT, make oath and state as follows: I, the plaintiff in this matter, have read the foregoing Verified Complaint, know and understand the contents thereof, and state that the same are true of my own knowledge except as to such matters therein stated to be on information and belief, and as to these matters I believe them to be true. I declare under the pains and penalties of perjury that the foregoing is true and correct.

SIGNED AND SUBSCRIBED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 2nd DAY OF AUGUST, 2024.

LIANA SURDUT

Respectfully Submitted:

LIANA SURDUT,
By her Attorney,

Patrick K. Daubert, Esq.
BBO#: 694802
DAUBERT LAW, PLLC
100 Independence Dr.
Suite 7-591
Hyannis, MA 02601
Tel: (508) 205-4350
Fax: (508) 437-0365
DaubertLaw@iCloud.com

DATED: AUGUST 2, 2024

| **Summons** | CIVIL DOCKET NO. 2472CV00342 | **Trial Court of Massachusetts** **The Superior Court** |
|---|---|---|

CASE NAME: ~~FILED~~

*Scott W. Nickerson, Clerk*

FILED

OCT 29 2024

BARNSTABLE, CS
SUPERIOR COURT

LIANA SURDUT

*Plaintiff(s)*

vs.

Town of Orleans, Kimberly Newman, Individually
And in capacity as Town of Orleans Town Manager, and
Mark Reil, Individually and in his official capacity as
Town of Orleans Assistant Town Manager *Defendant(s)*

Scott W. Nickerson    Clerk of Courts
Barnstable    County

COURT NAME & ADDRESS:

BARNSTABLE SUPERIOR COURT

3195 MAIN STREET

BARNSTABLE, MASSACHUSETTS 02630

THIS SUMMONS IS DIRECTED TO _Town of ORLEANS_ (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the _BARNSTABLE Superior_ Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the aintiff, if unrepresented). You can do this by:

    a) Filing your **signed original** response with the Clerk's Office for Civil Business, _BARNSTABLE Superior_ Court _3195 Main Street, Barnstable, MA 02603_ (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, **AND**

    b) Delivering or mailing **a copy** of your response to the Plaintiff's attorney/Plaintiff at the following address: _Patrick K. Daubert, Esq Daubert Law, PLLC, 100 Independence Dr. Suite 7-591 Hyannis, MA 02601_

**3. What to include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

**3. (cont.)** Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure**. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon.  Michael D. Ricciuti , Chief Justice on  OcToBeR 29 , 20 24 . (Seal)

Clerk    Scott W. Nickerson

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

---

PROOF OF SERVICE OF PROCESS

---

I hereby certify that on OcToBeR 29, 2024 I served a copy of this Summons, together with a copy of the Complaint

in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

IN HAND to Kelley DARLINE TOWN CLERK, TOWN of ORLEANS, Whom ACCEPTED IN Behalf of The TOWN of ORLEANS At the LAST ANO uSuAL ADDRESS : TOWN HAll ORLEANS CLeRKS office 19 School RD, ORLEANS, MA 0 2653 ANO By mAILING FIRST CLASS MAIL To The LAST ANO uSuAL ADDRESS.

Dated: OCToBeR 29, 2024

Signature

LuIZ GoNzAgA
CoNSTABLE

Fee: $75.00

**N.B.    TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date: OCToBeR 29, 2024

rev. 1/2023

| **Summons** | CIVIL DOCKET NO.<br>2472CV00342 | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

SUPERIOR COURT

CASE NAME BARNSTABLE, SS

OCT 29 2024    *LIANA SURDUT*

FILED                                    Plaintiff(s)

Scott W. Nickerson, Clerk    vs.

TOWN OF ORLEANS, KIMBERLY NEWMAN, INDIVIDUALLY AND IN HER CAPACITY AS TOWN OF ORLEANS TOWN MANAGER, AND MARK REIL, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS TOWN OF ORLEANS ASSISTANT TOWN MANAGER,

                                          Defendant(s)

Scott W. Nickerson — Clerk of Courts
Barnstable — County

COURT NAME & ADDRESS:
BARNSTABLE SUPERIOR COURT
3195 MAIN STREET    *Questionable*
BARNSTABLE, MASSACHUSETTS 02630

THIS SUMMONS IS DIRECTED TO *MARK REIL, INDIVIDUALLY AND IN HIS* (Defendant's name) *OFFICIAL CAPACITY AS TOWN OF ORLEANS ASSISTANT TOWN MANAGER.*

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the *BARNSTABLE SUPERIOR* Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, *BARNSTABLE Superior* Court *3195 MAIN STREET, BARNSTABLE, MA 02650* (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, **AND**

b) Delivering or mailing a **copy** of your response to the Plaintiff's attorney/Plaintiff at the following address: *PATRICK K. DAUBERT, ESQ. DAUBERT LAW, PLLC, 100 INDEPENDENCE DR. Suite 7-591, HYANNIS, MA 02601*

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

**3. (cont.)** Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure.** If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. _Michael D. Ricciuti_ , Chief Justice on _____ , 20___ . (Seal)

Clerk _Scott W. Nickerson_

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

---

### PROOF OF SERVICE OF PROCESS

I hereby certify that on _October 29, 2024_ I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

_IN HAND to Kelley Darling Town Clerk, Town of Orleans, whom accepted in behalf of Mark Reil, Individually and in his official capacity as Town of Orleans Assistant Town Manager at the last and usual address: Town Hall Orleans Clerk office 19 School Rd. Orleans, MA 02653 and by mail to the last and usual address_

Dated: _October 29, 2024_     Signature:

Fee: $75.00     _Luiz Gonzaga_
                _Constable_

**N.B.  TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date: _October 29, 2024_

SUPERIOR COURT
BARNSTABLE, SS

*Summons*

CIVIL DOCKET NO.

2472CV00342

**Trial Court of Massachusetts**
**The Superior Court**

CASE NAME:

OCT 29 2024

FILED

*Scott W. Nickerson, Clerk*

LIANA SURDUT

Plaintiff(s)

Scott W. Nickerson
Barnstable

Clerk of Courts
County

COURT NAME & ADDRESS:

BARNSTABLE SUPERIOR COURT

TOWN OF ORLEANS; KIMBERLY NEWMAN, INDIVIDUALLY AND
IN HER CAPACITY AS TOWN OF ORLEANS TOWN MANAGER, AND
MARK REIL, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS TOWN
OF ORLEANS ASSISTANT TOWN MANAGER,

Defendant(s)

3195 MAIN STREET          *Questionable*

BARNSTABLE, MASSACHUSETTS 02630

THIS SUMMONS IS DIRECTED TO KIMBERLY NEWMAN, INDIVIDUALLY
AND IN HER OFFICIAL CAPACITY AS TOWN
OF ORLEANS TOWN MANAGER (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the *Barnstable Superior* Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the aintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, *Barnstable Superior* Court *3195 Main Street, Barnstable, MA 02630* (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, **AND**

b) Delivering or mailing **a copy** of your response to the Plaintiff's attorney/Plaintiff at the following address: *Patrick K. Daubert, Esq. Daubert Law, PLLC, 100 Independence Dr. Suite 7-591, Hyannis, MA 02601*

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

**3. (cont.)** Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure.** If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. __Michael D. Ricciuti__ , Chief Justice on _OCTOBER 29_ , 20_24_ . (Seal)

Clerk      __Scott W. Nickerson__        _Scott W. Nickerson_

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

---

### PROOF OF SERVICE OF PROCESS

I hereby certify that on _October 29, 2024_ , I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

_IN HAND to Kelley Darling Town Clerk, Town of Orleans, Whom Accep
in Behalf of Kimberly Newman Individually and in her Capacity as Town of Orleans
Town Manager at the Last and Usual Address: Town Hall Orleans, Clerk Office
19 School Rd, Orleans, MA 02653 and By Mailing First Class Mail to the Last and
usual Address._

Dated: _Oct 29, 2024_              Signature: _____

_Luiz Gouzaga
Constable_

Fee: _$75.00_

**N.B.  TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date: _October 29, 2024_